## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                                       :
Cassandra S.[1],                                       :          3:22-CV-328 (MPS) (RMS)
    Plaintiff,                                         :
                                                       :
V.                                                     :
                                                       :
KILOLO KIJAKAZI, ACTING                                :
COMMISSIONER OF SOCIAL                                 :
SECURITY,                                              :
    Defendant.                                         :
                                                       :          DATE: JANUARY 27, 2023
                                                       :
------------------------------------------------------ x
```

## RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This is an administrative appeal following the denial of the plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act. It is brought pursuant to 42 U.S.C. § 405(g).

The plaintiff now moves for an order reversing and remanding the decision of the Commissioner of the Social Security Administration (the "Commissioner") for the payment of benefits. (Doc. No. 12) In the alternative, the plaintiff seeks an order remanding her case for a rehearing. (*Id.*) The Commissioner, in turn, has moved for an order affirming her decision. (Doc No. 14) For the reasons discussed below, the Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the Commissioner's decision be **GRANTED in part**

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

and **denied in part**, and the Commissioner's motion for an order affirming that decision be **DENIED**. The Court further recommends vacating the Commissioner's decision and remanding for further proceedings to develop the record.

## I.    PROCEDURAL HISTORY

### A.    The 2015 Claim

On July 10, 2015, the plaintiff filed applications for both DIB and supplemental security income benefits ("SSI") benefits. (Doc. No. 8, Certified Transcript of Administrative Proceedings, dated March 31, 2022 ["Tr."] 87). In both of these applications, the plaintiff alleged disability beginning January 1, 2014. (*Id.*). After being denied at the initial and reconsideration stages, the plaintiff was granted a hearing on July 15, 2016, before Administrative Law Judge ("ALJ") John Noel. (*Id.*). The plaintiff chose to appear and testify without the assistance of an attorney or other representative. (*Id.*).

On May 21, 2018, the ALJ rendered an unfavorable decision as to both applications. (*See* Tr. 84-104). The ALJ found that that the plaintiff had several severe impairments including epilepsy, degenerative disk disease, obesity, major depressive disorder, and headaches, but that she was ultimately not under a disability. (*See id.*). The Appeals Council denied review of that decision on February 1, 2019. (Tr. 107-113). The plaintiff, again appearing *pro se,* initiated a civil action in this Court seeking review of the decision on March 22, 2019. *See Cassandra S. v. Commissioner of Social Security*, 3:19-cv-431(MPS) (D. Conn. 2019).[2] On August 16, 2019, the Court (Shea, J.) dismissed the case without prejudice as the plaintiff had failed to file a motion to reverse the decision of the Commissioner. *See id.* at Doc. No. 14. To date, the plaintiff has not moved to reopen that action.

---

[2] The original case caption has been changed to comport with the District's standing order. *See supra* note 1.

**B.    The 2018 Claim**

On July 10, 2018, the plaintiff filed another application for DIB claiming that she had been disabled since March 31, 2015, due to multiple myeloma, bipolar disorder, depression, and anxiety. (Tr. 10, 130).  The plaintiff's application was denied initially and upon reconsideration.  (Tr. 10, 114-128, 161-164, 165-70 (initial decision); Tr. 130-147, 172-174, 175-179 (reconsideration)). On November 3, 2020, a hearing was held before ALJ John Aletta at which the plaintiff, who was now represented by counsel, and a vocational expert testified.  (Tr. 40-83).  On February 10, 2021, the ALJ issued an unfavorable decision denying the plaintiff DIB benefits for the period of March 31, 2015, though her date last insured ("DLI"), which was December 31, 2020.  (Tr. 6-28, 13).  On January 24, 2022, the Appeals Council denied the plaintiff's request for review of the Commissioner's decision, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1).

On February 28, 2022, the plaintiff filed her complaint in this pending action.  (Doc. No. 1). Absent the parties' consent to the jurisdiction of a United States Magistrate Judge, the case was transferred to the undersigned on May 6, 2022, for all purposes including issuing a recommended ruling.  (Doc. No. 11).  On June 2, 2022, the plaintiff filed her Motion to Reverse the Decision of the Commissioner, (Doc. No. 12), with a Statement of Material Facts, (Doc. No. 12-2), a brief in support, (Doc. No. 21-1), and three exhibits.  (Doc. Nos. 12-3, 12-4, 12-5).  On August 12, 2022, the Commissioner filed her Motion to Affirm (Doc. No. 14), with a responding Statement of Material Facts, (Doc. No. 14-2), and a brief in support.  (Doc. No. 14-1).  The plaintiff filed a reply on August 31, 2022.  (Doc. No. 17).[3]

---

[3] On September 1, 2022, the plaintiff's counsel filed a notice on the docket stating that the plaintiff had filed a successive application for SSI benefits on March 31, 2021, and the Commissioner had granted that application.  (*See* Doc. No. 18).  The plaintiff's counsel also attached a "Notice of Decision – Fully Favorable" dated August 25, 2022, from the Social Security Administration which was sent to the plaintiff.  (*See* Doc. No. 18-1 at 1, 10).  This notice

## II.    **FACTUAL BACKGROUND**

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts.  (*See* Doc. Nos. 12-2, 14-2).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.    **The Plaintiff's 2020 Hearing Testimony[4]**

On November 3, 2020, the ALJ held a telephonic hearing at which the plaintiff and a vocational expert ("VE"), Dale Pasculli, testified.[5]  (Tr. 40-41).  At this hearing, the plaintiff was represented by counsel.  (*Id.*).

At the time of the hearing, the plaintiff was fifty-one years old and had obtained an undergraduate college degree and her nursing license.  (Tr. 46).  The ALJ went through the plaintiff's work chronologically.  The plaintiff testified that she first worked as a nurse at a temporary nursing agency between 2007 and 2008 as well as in 2013, and she performed this work in a variety of locations such as hospitals, schools, and nursing homes.  (Tr. 47).  She described her work as having to do "a copious amount of different" things but mainly she had a dual role of providing "hands on" "typical nursing services" to the patients on her unit as well as a managing a number of CNAs (certified nursing assistants).  (Tr. 48-49).  As a nurse, she administered medications, took care of patients and their wounds, took notes, developed care plans, and gave handoff reports to other nurses.  (*Id.*).  As a manager, her duties included hiring, evaluating and

---

stated that the Commissioner found that the plaintiff had become disabled on March 31, 2021.  (*Id.*).  Specifically, the ALJ's decision found that she had the following severe impairments: multiple myeloma, neuropathy, lumbar spine degenerative disc disease, cervical spine degenerative disc disease, and a history of seizures.  (*Id.* at 4-5).  However, as stated, this finding of disability was only for SSI benefits—which has no bearing on the second application of DIB benefits at issue here—and the determination has no retroactive effect before March 31, 2021.

[4] While ALJ Noel's decision from the 2015 claim was included in the administrative record for this appeal, the hearing transcript for that claim was not.

[5] The hearing took place by phone due to the conditions imposed by the COVID-19 pandemic.  (Tr. 42).

terminating the CNAs she supervised.  (*Id.*).  At this job, the plaintiff was standing and walking at least 80 percent of the time and had to lift between fifteen to twenty pounds.  (Tr. 49-50).

The plaintiff testified that she worked for Haven Health Center in 2005 where she had "basically the same" job, *i.e.*, performing both hands-on nursing duties and CNA management duties.  (Tr. 50).  She also stated she would regularly carry at least fifteen pounds.  (Tr. 51).  Similarly, in 2006, she worked at Acquire Health Services performing the same two jobs there with the same lifting, walking and standing requirements.  (Tr. 51-52).  Also, in 2006, she worked at Preferred Professional Services, again performing the same duties with the same physical exertion.  (Tr. 51-53).  Between 2009 and 2011, she had another job "doing the same thing, but it was much more strenuous because it was working with physically and mentally disabled individuals" in a group home.  (Tr. 53).  She estimated that she had to lift and carry between 25 to 30 pounds and had to stand/walk at least 80 percent of the time.  (Tr. 53-54).  In 2012, she provided the same nursing services for Benchmark Senior Living, a long-term dementia and rehab facility.  (Tr. 54).  She still lifted and carried at least fifteen pounds but "helped the CNAs more."  (Tr 54-55).  At all of these jobs, she also performed a supervisory role in evaluating the CNAs and having the authority to fire them.  (Tr. 55).

The plaintiff testified that she could no longer work because of her inability to focus or concentrate as well as her physical and mental "status."  (Tr. 56).  She complained of pain through her entire body due to fibromyalgia.  (Tr. 56).  She was on several medications for insomnia because she could not sleep well; aspirin and other pain medication for "continued pain all over [her] body," knees, back, and upper extremities and lower legs; as well as medication to treat her bipolar disorder and seizures.  (Tr. 57).  She testified that her medications' side effects made her lethargic, drowsy, and unable to concentrate.  (Tr. 58).  She also received injections for her multiple

myeloma, which was currently in remission, and these injections would make her lethargic. (Tr. 59).

The plaintiff stated she went to therapy every two weeks and had tried taking anti-depressants but could not function on them. (Tr. 60). She had checked herself into a hospital at least once in the "few years" prior due to her depression after she had an incident with her landlord and was arrested and put on probation. (Tr. 60-61). After her arrest, she was not incarcerated but put into a "mental place." (Tr. 61). She denied ever having been fired from a job for fighting, having difficulties getting along with others, or abusing alcohol or drugs. (Tr. 61-62, 63).

The plaintiff testified that she could only currently lift/carry less than five pounds and had issues with bending. (Tr. 62). She claimed she had problems with memory and concentration and was not "as sharp as I should be." (Tr. 62-63). She believed that these problems came from her physical and mental medical issues, her diseases, and the medications she was taking. (Tr. 63). She testified to having good periods of "feel[ing] fine" which could last for two to four weeks followed by periods where she was "just a mess" that could last up to "another eight weeks." (Tr. 63).

As to her activities of daily living, the plaintiff testified that she lived alone and could not cook or clean for herself. (Tr. 63-65). However, a residential aide ("RA") would cook and clean for her, and a nurse would give her medications. (*Id.*). Over the prior three months, the RA would visit four times a week and help her with bathing and other personal hygiene activities. (*Id.*). The RA would also take her grocery shopping and to her appointments. (Tr. 67). At most, the plaintiff could help "wipe things." (Tr. 65). Prior to hiring the RA, she only ate prepared meals and had Meals on Wheels delivered to her; when she needed to go the store, her nephew would take her

and push the cart while she rode an electric scooter. (Tr. 65). Though she did "light house cleaning," she could "barely" perform her own personal hygiene routine. (*Id.*).

As to how she passed her time in the last three years, the plaintiff testified that she had not "done basically anything." (Tr. 66). She stated that would watch TV and attend medical appointments. (Tr. 66-67). Her nephew or daughter would take her to visit her mother, she occasionally would have one or two girlfriends come over, and she sometimes received visits or calls from her children. (Tr. 66). Her inability to drive or take the bus otherwise kept her in her house. (*Id.*). She did not use the internet and did not have cable. (*Id.*). She had not left Connecticut in the last three years. (*Id.*).

Upon examination by her attorney, she testified that her past easiest nursing job did not require lifting and that, if somebody "gave her that job today," she could do it but only after she got her physical pain and cognition "under control." (Tr. 69). However, she then answered that, if she was given a full-time job today, she would not be able to go to work because of her symptoms. (*Id.*). She testified to having difficulty following instructions and to having made mistakes in her notes because her "mind would just go off track." (*Id.*). She had poor sleeping habits which compromised her ability to try to exercise and get into a routine. (*Id.*). When she became depressed, she would cry and go to therapy. (*Id.*). Her "bad times," which generally prevailed, were "really, really bad" and lasted a long time, while her "good times [were] far in between." (Tr. 70). As to her pain, she indicated she was doing acupuncture in addition to pain medications for her fibromyalgia and that she had a cane and a walker. (Tr. 70-71).

## B.    The VE's Testimony

Before the VE testified, the plaintiff's counsel objected generally to the VE opining on the number of jobs which existed in the national economy that the plaintiff could perform and to the

VE's general competency to offer such opinions. (Tr. 71). Defense counsel did so by referring to

a letter outlining his objection sent to the local Social Security office prior to the hearing.[6] (*Id.*).

The ALJ noted the objection but did not rule from the bench.[7] (Tr. 71-72). The plaintiff's counsel

indicated he would not seek additional time to file a post-hearing brief. (*Id.*).

The VE affirmed that she had listened to the plaintiff's testimony and examined a single

exhibit in the plaintiff's file. (Tr. 72). The ALJ asked the VE to summarize only the jobs the ALJ

had discussed with the plaintiff. (Tr. 72-73). The VE stated that the plaintiff had "actually two

jobs," and they were composite: (1) "Nurse, general duty" (DOT 075.340-010, SVP 7, medium

exertion) and (2) "Nurse, supervisor" (DOT 075.167-010, SVP 7, light exertion). (Tr. 72). Both

"were performed at the light exertional level, with the exception of the one job at the group home,

New Seasons, which was performed at medium." (*Id.*). The ALJ determined that the plaintiff was

performing a composite job.[8]

---

[6] Plaintiff's counsel stated, "[T]he objection's in 8E," referring to exhibit 8E. (Tr. 71). That exhibit was a May 13, 2020 letter to the Hartford Social Security office, with appended exhibits. (*See* Tr. 379-435). In support of the objection, the plaintiff's counsel argued that, "[a]lthough the VE may have experience in vocational rehabilitation, this does not confer 'reliability' on the opinions related to numbers of jobs" and a recent United States Supreme Court decision, *Biestek v. Berryhill,* 203 L. Ed. 2d 504, 139 S. Ct. 1148, 1150 (2019), allowed for cross examination as to the VE's supporting data. (*See* Tr. 380-382). Accordingly, the letter requested that the ALJ issue a subpoena to the VE to bring or make available through identification all of the documents that the VE relied on in rendering her opinion. (*Id.*).

[7] The full excerpt of that exchange states:
> ALJ: Okay. Counsel, do you have any objection to Ms. Pasculli testifying as a vocational expert in this case?
> Atty: The objection's in 8E.
> ALJ: Okay. Counsel, the – are you seeking additional time to file a post-hearing brief regarding the vocational expert?
> Atty: Not at this time.

(Tr. 72).

[8] When first questioned by the ALJ as to whether these jobs were part of a composite job, the VE stated that, "given more clarification from the" plaintiff, these jobs were done separately, *i.e.*, they "would be two jobs." (Tr. 73-74). The plaintiff was then questioned by the ALJ, and the plaintiff confirmed she was "doing these jobs at the same time, around the same time period." (Tr. 74). The VE then stated she was confused by the testimony. (Tr. 75). After further clarification by the plaintiff that, in any given day, the plaintiff could have been performing both nursing and supervisor duties, the VE finally affirmed that "they were part of a composite job" and that this opinion was consistent with the DOT. (*Id.*).

The ALJ then posited to the VE several hypotheticals of various individuals mirroring the plaintiff's age, education, and experience but with different residual functional capacities ("RFC"s). (*Id.*). First, the ALJ posited a hypothetical with the following RFC:

> [A] light exertional level. Further, the hypothetical person could occasionally climb ramps and stairs, cannot [climb] ladders, ropes or scaffolds; occasionally balance, occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl. Further, the hypothetical person cannot work at unprotected heights, and could not operate machinery having moving, mechanical parts, which are exposed. And further, the hypothetical person can perform simple, routine tasks, but not at a strict, production-rate pace, and can execute simple, routine instructions. In addition, the hypothetical person can tolerate occasional, brief interaction with the general public and occasional interaction with co-workers. Finally, the hypothetical person cannot engage in tasks requiring close collaboration or teamwork with co-workers.

(Tr. 76).

The VE testified that this first hypothetical person could not perform any of the plaintiff's prior work. (*Id.*). However, the VE said that the same hypothetical person could perform several jobs that were available in the national economy, including: (1) cleaner, housekeeping (DOT 23.687-014, SVP 2, light exertion, with 103,000 jobs available in national economy); (2) routing clerk (DOT 222-687-022, SVP 2, light exertion, with 33,000 jobs available in national economy); and, (3) photocopy machine operator (DOT 207.685-014, SVP 2, light exertion, with 8,100 jobs available in national economy). (Tr. 66-67). The VE affirmed that this testimony and opinion was consistent with the DOT, except that the DOT did not specifically address the considerations concerning "performing simple, routine tasks, but not at a strict, production-rate, pace, executing simple routine instruction, tolerating occasional, brief interaction with the general public and occasional interaction with co-workers, and being unable to engage in tasks requiring close collaboration or teamwork with coworkers." (Tr. 77-78). The VE affirmed that her testimony "with respect to those limitations" was based on her overall professional expertise and that she had "actually seen these three jobs performed." (Tr. 78).

9

The ALJ posited a second hypothetical, based off of the first, with the additional limitation that the hypothetical person would be "off task" fifteen percent of the time during each eight-hour work day. (*Id.*). The VE stated there were no jobs in the national economy that such a hypothetical person could perform. (*Id.*).

In a third hypothetical, also based off the first, the person would additionally be "absent from work two days per month, on a random, unscheduled basis." (*Id.*). The VE stated there were no jobs in the national economy that such a hypothetical person could perform. (*Id.*).

Lastly, in a fourth hypothetical, also based off the first, the hypothetical person could not "interact appropriately with co-workers 15% of the time during each 8-hour workday." (Tr. 78-79). Again, the VE stated there were no jobs in the national economy that such a hypothetical person could perform. (*Id.*).

Regarding these three additional hypotheticals, the VE testified that the basis for her conclusions was her professional experience as the DOT did not specifically address the discussed limitations. (Tr. 79). Additionally, the VE confirmed that all of her testimony—other than the matters not specifically addressed by the DOT—was consistent with the DOT. (*Id.*). She explained that the source of the job numbers she had opined to came from a software program she utilized known as Job Browser Pro provided by SkillTRAN. (Tr. 79-80). She testified that Job Browser Pro employed data from the Department of Labor's Bureau of Labor Statistics. (*Id.*). The VE further testified that the program does not "list the actual number of jobs, [*i.e.*,] specific jobs for each job." (*Id.*). Instead, it has "numbers in each category, so I take the full number of jobs in the category and divide it by the number of jobs in the category to come up with a rough estimate." (*Id.*).

On cross-examination, the VE further testified that a person would be employable both if they were off task only for ten percent of the workday and if they missed only one day of work per month. (Tr. 80). She affirmed that the jobs identified in response to the ALJ's hypotheticals were unskilled and simply and required a person to pay attention and concentrate for two hours at a time. (Tr. 81-82). She also stated that, even if all the non-exertional limitations were removed, and the exertional level remained light, she would still provide the same job numbers. (Tr. 82).

Regarding SkillTRAN, the VE testified that the program reported the number of jobs by SOC (Standard Occupational Classification) groups[9] and employed a "government crosswalk" between the broad categories on the SOC and the specific DOT entries. (Tr. 79-80). The VE denied using the "occupational entity method" and instead stated that she used her own mathematical method that involved basic division, *e.g.*, if there were ten DOT job entries in one SOC, she would "kind of divide by 10." (Tr. 81). She affirmed that there were no written guidelines to her methodology and that she had never independently tested the reliability or accuracy of the source of her numbers. (*Id.*). Further, she was not able to provide job numbers for the regions where the plaintiff lived or in any geographical increment smaller than the nation. (Tr. 82). Lastly, she testified that, although the Department of Labor did not publish any data that confirmed her testimony regarding teamwork requirements, the SOC job descriptions did. (*Id.*).

### III. THE ALJ'S DECISION

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Social Security Act ("SSA").

---

[9] Per the U.S. Bureau of Labor Statistics, the Standard Occupational Classification ("SOC") system is a federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data. All workers are classified into one of 867 detailed occupations according to their occupational definition. *See* Bureau of Labor Statistics, Standard Occupational Classification, https://www.bls.gov/soc/ (last visited December 27, 2022). The last SOC update was issued in 2018. *See id.*

*See* 20 C.F.R. § 404.1520(a).[10]  Prior to his analysis, the ALJ admitted additional exhibits into the record, including records from the plaintiff's visiting nurse treatment.  (Tr. 10-11).  The ALJ also determined that the plaintiff met the insured status requirements under the SSA through December 31, 2020.  (Tr. 13).

At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date ("AOD") of March 31, 2015, and her through her date last insured  of December 31, 2020.  (Tr. 13).  However, as explained more fully below, this AOD was erroneous. *See* Part V.A, *infra*.  At step two, the ALJ determined that the plaintiff had the following severe impairments: degenerative disc disease, obesity, patellofemoral syndrome of both knees, seizure disorder, multiple myeloma, bipolar disorder, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and personality disorder.[11]  (*Id.*).

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 13).  In determining so, the ALJ considered Listings 1.04 (Disorders of the Spine), 13.07

---

[10] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied.  *Id.*  If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[11] The ALJ determined the plaintiff's empty and expanded sella turcica and hypertension to both be non-severe impairments.  (Tr. 13).  The ALJ did not find fibromyalgia a medically determinable impairment due to a lack of objective medical evidence confirming this diagnosis, per Social Security Ruling 12-2p.  (*Id.*).  The plaintiff does not take issue with these findings.  (*See generally* Doc. No. 12-1).

(Multiple Myeloma), 12.04 (Depressive, Bipolar and related disorder), 12.06 (Anxiety and Obsessive-Compulsive Disorders), 12.08 (Personality and Impulse-Control Disorders), and 12.11 (Neurodevelopmental Disorders). (Tr. 13-15). *See* 20 C.F.R. part 404, Subpart P, Appendix 1.

Next, the ALJ formulated the plaintiff's mental and physical residual functional capacity. (*See* Tr. 15-26). The ALJ determined the plaintiff had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b), with the following additional limitations: She could occasionally climb ramps and stairs, but could not climb ladders, ropes or scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. She could not work at unprotected heights, and could not operate machinery having moving, mechanical parts, which are exposed. She could perform simple, routine tasks, but not at a strict, production rate pace, and could execute simple, routine instructions. She could tolerate occasional, brief interaction with the general public and occasional interaction with co-workers. She could not engage in tasks requiring close collaboration or teamwork with co-workers.

(Tr. 15).

At step four, the ALJ classified her past relevant work ("PRW") as a composite job of nurse, general duty (DOT: 075.364-010, SVP 7, medium exertion) and nurse, supervisor (DOT: 075/167-010, SVP 7, light exertion). (Tr. 26-27). The ALJ found that, given her RFC, the plaintiff could not perform any of her PRW. (*Id.*).

At step five, the ALJ concluded that, through the date last insured, and considering the plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. (Tr. 27-28).[12] Namely, the ALJ found that the plaintiff could perform the three jobs the VE had opined to at the hearing: cleaner/housekeeper, routing clerk, and photocopy machine operator. (*Id.*). The ALJ found that the VE's testimony was consistent with the DOT and adopted and

---

[12] The ALJ also found that (a) the plaintiff was of advanced age at the time of his decision; (b) the plaintiff had a high school education; and (c) the "transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (Tr. 27).

accepted the VE's testimony. (*Id.*). Ultimately, the ALJ concluded that a finding of "not disabled" was appropriate under the controlling regulations. (*Id.*).

## IV.    **STANDARD OF REVIEW**

"To be considered disabled under the [SSA] and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified 'by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Young v. Berryhill*, No. 3:17-CV-00970 (SALM), 2018 WL 2947860, at *3 (D. Conn. June 12, 2018) (quoting 42 U.S.C. § 423(d)(1)(A)). To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c) (requiring that the impairment(s) "significantly limit[ ] ... physical or mental ability to do basic work activities[ ]" to be considered "severe").

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). A court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Instead, the court's function is to first ascertain whether the Commissioner applied the correct legal principles in reaching her conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial

evidence.[13]  *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).  "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law."  *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled."  *Id.*

## V.    DISCUSSION

The plaintiff raises a plethora of arguments and sub-arguments she contends warrant remand here.  (*See generally* Doc. 12-1 at 4-22).  These include three arguments involving purported failures to adequately develop the record (*id.* at 5-10); three arguments claiming error regarding the persuasiveness of medical opinions (*id.* at 10-16); four arguments claiming the ALJ committed various legal errors by failing to adequately articulate his evaluation of different medical source statements and opinions in the record (*id.* at 16-19); a challenge to the ALJ's step three analysis of Listing 13.07 (*id.* at 19-21); and two challenges concerning the VE's opinions (*id.* at 21-22).  Because the Court finds that remand is warranted to further develop the record, the Court will only address those additional arguments that are necessary to provide guidance to the ALJ on remand.[14]

---

[13] The Second Circuit has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence must be "more than a mere scintilla or touch of proof here and there in the record." *Williams*, 859 F.2d at 258.

[14] Specifically, because the Court is remanding on other grounds, the Court declines to reach the three arguments claiming error regarding the persuasiveness of medical opinions, (*id.* at 10-16), and the four arguments claiming the ALJ committed various legal errors by failing to adequately articulate his evaluation of different medical source statements and opinions in the record. (*Id.* at 16-19).

A.      The Proper Alleged Onset Date

In addressing a related argument concerning "constructive reopening," *see* Part V.C, *infra*, the Commissioner concedes that the ALJ erred in determining an AOD of March 31, 2015, in this case and believes that the "proper date" to begin review for the 2018 Claim should be May 1, 2018. (*See* Doc. No. 14-1 at 7-8). The Commissioner further contends that this error was harmless. (*Id.*). As this case is being remanded, it is incumbent on the Court to first address the proper time frame for the ALJ to adjudicate on remand before addressing the other legal issues raised by the plaintiff.

"When a plaintiff has filed a previous unsuccessful application for benefits, the period at issue begins from the day after the date of the earlier decision by the Commissioner denying the plaintiff's application," *i.e.*, the ALJ's denial, "rather than from the plaintiff's alleged onset date of disability." *Martin v. Colvin*, No. 14-CV-0843, 2015 WL 5794278, at *8 n.1 (E.D.N.Y. Sept. 30, 2015). *See Goncalves v. Berryhill*, No. 3:17-CV-01830 (JCH), 2018 WL 6061570, at *5 n.1 (D. Conn. Nov. 20, 2018) (accepting the Commissioner's acknowledgment in her briefing that it is "the ALJ's Decision, not the Appeals Council notice denying review, [that] stands as the final decision of the Commissioner").

As described above, the plaintiff previously filed SSI and DIB applications in July 2015 (the "2015 Claim"). (Tr. 87). Both applications stated an AOD of January 1, 2014. (*Id.*). The 2015 Claim was denied by the ALJ on May 21, 2018. (Tr. 87, 107). The ALJ's denial then became the final decision of the Commissioner when the Appeals Council later denied review on February 1, 2019. (*Id.*).[15] But, while review of the 2015 Claim was pending before the Appeals Council, the plaintiff filed the DIB-only claim at issue in this case on July 10, 2018, (the "2018 Claim"). (Tr. 10). The 2018 Claim stated an AOD of March 31, 2015. (*Id.*). This AOD, however, was

---

[15] As discussed above, though the plaintiff initially sought review of the 2015 Claim in the district court, she failed to prosecute the appeal. *See* Part I, *supra*.

erroneous and the proper AOD the ALJ shall consider upon remand is the day after the ALJ's

denial of the 2015 Claim, which is May 22, 2018. *Martin*, 2015 WL 5794278, at *8 n.1.

The Court additionally agrees that this error, on its own, was harmless because the fact that

an earlier AOD was in fact employed by the ALJ only inured to the plaintiff's benefit. However,

upon remand, the ALJ shall assess the plaintiff's application using the correct AOD of May 22,

2018.

### B.    Adequate Development of the Record

The Court addresses first whether the record was adequately developed because it is a

threshold question, regardless of whether the ALJ's decision is otherwise supported by substantial

evidence. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ("Before determining whether

the Commissioner's conclusions are supported by substantial evidence, a reviewing Court must

first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance

with the beneficent purposes of the [Social Security] Act.") (quoting *Cruz v. Sullivan*, 912 F.2d 8

(2d Cir.1990) (quotation marks omitted)

The plaintiff raises three discrete arguments as to how the ALJ failed to develop the record.

First, the ALJ erred by not requesting medical records, each of which are mentioned in the

administrative record, from (a) an April 2019 visit to Yale New Haven Hospital ("Yale"), (b) her

inpatient hospitalization at the Whiting Forensic Institute ("Whiting"), and (c) a May 2020

neuropsychological evaluation performed by Kimberly Maynard, Psy.D. on May 13 and 19, 2020

(the "Maynard Evaluation"). (*See* Doc. No. 12-1 at 5-7; Doc. No. 17 at 2). Second, the ALJ erred

by failing to obtain a medical source statement regarding the plaintiff's mental health from any of

the plaintiff's mental health providers. (*Id.* at 7-9). Third, the ALJ "constructively reopened" the

2015 Claim decision by reviewing records going as far back as March 2015, and accordingly all

17

of the records underlying the 2015 Claim should have also been considered in rendering the decision here.  (*Id.* at 9-10).

### 1.    Whether the Second Circuit's Decision in *Hairston-Scott* Controls

As an initial matter, the parties disagree on the legal principles applicable to resolving this issue.  The plaintiff asserts, and the record confirms, that the Yale records, Whiting records, and Maynard Evaluation were referenced in the administrative record but were not admitted before the ALJ or considered in his decision.  (Doc. No. 12-1 at 5-7; *see* Tr. 3300, 3302 (December 24, 2019, treatment note mentioning that "[s]he was evaluated at [Y]ale on April 2019 for autoHCST," a treatment for myeloma); Tr. 555 (treatment note stating that the plaintiff had been a "resident of Whiting Forensic Institute [and] has a history of bipolar disorder, PTSD and needs conservatorship"),  Tr. 2984 (February 24, 2020, treatment note stating she was "diagnosed with multiple myeloma while at Whiting");  Tr. 2990 (February 24, 2020, treatment note describing plaintiff as a "50 year old woman with PTSD, ADHD, Bipolar I who is currently unstable" and sent for a "neuropsych referral today").

The plaintiff contends that SSA guidelines and the Second Circuit's opinion in *Lundie v. Kijakazi*, No. 21-1203-CV, 2022 WL 1154122, at *2 (2d Cir. Apr. 19, 2022) (summary order), triggered the ALJ's affirmative duty to seek these records.  (Doc. No. 12 at 6-7; Doc. No. 17 at 2-3).  The plaintiff has now appended the Whiting records, (Ex. B., Doc. No. 12-4), the Maynard Evaluation (Ex. C., Doc. No. 12-5), and the April 2019 Yale records (Ex. A., Doc. No. 17-1), to her briefing papers to establish that their omission was "significant" and, consequently, that the ALJ's failure to obtain them constitutes harmful error and warrants remand.  (Doc. No. 12 at 6-7; Doc. No. 17 at 2-3).  *Santiago v. Astrue*, No. 3:10-CV-937 CFD, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) ("When an unsuccessful claimant files a civil action on the ground of

inadequate development of the record, the issue is whether the missing evidence is significant.")
(citing *Pratts v. Chater*, 94 F.3d 34, 37–38 (2d Cir.1996)).  *Accord DeMico v. Berryhill*, No. 3:17-
CV-00805, 2018 WL 2254544, at *7 (D. Conn. May 17, 2018) (Merriam, J.) (citing same); *Parker
v. Colvin*, No. 3:13-CV-1398 CSH, 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015).

      The Commissioner argues that, as a general matter, there was "adequate" medical evidence
to render a decision.  (Doc. No. 14-1 at 3).  Further, the Commissioner's brief argues that, pursuant
to § 405(g) of the Social Security Act and the decision in *Hairston-Scott v. Comm'r of Soc. Sec.*,
No. 20-758, 2021 WL 3777581, at *2 (2d Cir. Aug. 26, 2021) (summary order), the ALJ would be
precluded from considering such records.   Under this precedent, "[a] federal court will consider
new evidence only to determine whether it provides a basis for remand to the Commissioner."
*Hairston-Scott*, 2021 WL 3777581, at *2 (citing 42 U.S.C. § 405(g)).   "To justify an order
requiring the Commissioner to consider additional evidence, (1) the proffered evidence must be
'new and not merely cumulative of what is already in the record,' (2) it must be 'material,' and (3)
the claimant must show that 'good cause' existed for her failure to present the evidence earlier."
*Id.* (quoting *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988)) (internal quotation marks and
citations omitted).  The gravamen of the Commissioner's argument, then, is that the plaintiff is
attempting to induce this Court to order the ALJ to consider the newly attached records and that
such an order would be improper because the attached records are cumulative, immaterial, and
submitted at this juncture without good cause as to why they were not provided earlier.  (*See* Doc.
No. 14-1 at 3-5).

      The Commissioner's argument is misplaced.  The plaintiff has not moved for an "order
[that] additional evidence [] be taken before the Commissioner of Social Security," 42 U.S.C. §
405(g), or framed her argument in this way.  Nor will the Court issue such an order here.   The

plaintiff seeks remand on the argument that clear gaps exist in the administrative record concerning the treatment of her multiple severe impairments and that the ALJ was required investigate and fill those gaps. (*See* Doc. No. 12-1 at 6-7; Doc. No. 17 at 2-3). She has now provided these records to the Court to prove such a gap exists and demonstrate that the ALJ's failure to develop the record by seeking such records was harmful. (*Id.*). Failure to develop the record is a well-settled and independent ground for remand. *See Rosa v. Callahan*, 168 F.3d 72, 83 n.5 (2d Cir. 1999); *Moran*, 569 F.3d at 114–15. As such, the Court "may consider [the] new evidence" but "only as a basis for remand, not as a basis for reconsideration of the determination of the Commissioner." *Petty v. Colvin*, No. 12 CIV. 1644 LTS RLE, 2014 WL 2465109, at *2 (S.D.N.Y. June 2, 2014). And while the Court does not order any new evidence to be considered on remand, because the Court concludes below that gaps do exist and remands for a new hearing, the Court observes that "the [p]laintiff may submit any additional medical records she deems relevant to her application for disability benefits" upon rehearing. *Tammy L. v. Kijakazi*, No. 3:21-CV-01026 (KAD), 2022 WL 2952626, at *10 (D. Conn. July 26, 2022). This necessarily may include the appended records.[16] *See Rosado v. Saul*, No. 19 CIV. 8073 (PED), 2021 WL 22153, at *13 (S.D.N.Y. Jan. 4, 2021) (explaining that a plaintiff who failed to show good cause when submitting new evidence "will nonetheless have the opportunity to submit any new evidence to the Commissioner upon remand" pursuant to 20 C.F.R. §§ 404.977(e)(2), 416.1477(e)(2), 404.983, 416.1483).

---

[16] The Court is aware of the implication that may arise here that a plaintiff's "refusal to obtain and submit the very documents which he now argues are so vital. . . would simply provide savvy claimants and/or their representatives a hidden mechanism with which to obtain remand." *DeMico v. Berryhill*, No. 3:17-CV-00805(SALM), 2018 WL 2254544, at *7 (D. Conn. May 17, 2018) (Merriam, J.). However, the Court agrees that "the law of this Circuit places the burden on the ALJ, not the claimant, to develop the administrative record." *Id.* (citing *Tejada v. Apfel*, 167 F.3d at 770 774 (2d Cir. 1999)). *See Parker v. Colvin*, No. 3:13-CV-1398 CSH, 2015 WL 928299, at *12 n.14 (D. Conn. Mar. 4, 2015) (addressing the same argument and reaching the same conclusion).

### 2.      The Applicable Legal Standard

It is well-settled that, in Social Security disability proceedings, both parties carry burdens of evidentiary production.  In general, the claimant must prove to the Commissioner they are "blind or disabled" and "must inform [the Administration] about or submit all evidence known to [them] that relates to whether or not [they are] are blind or disabled."  20 C.F.R. § 404.1512.  However, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  *DeMico*, 2018 WL 2254544, at *7 (quoting *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)); *see Rosa*, 168 F.3d at 79.  *See also Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005) ("Indeed, the [disability evaluation process] is investigatory, or inquisitorial, rather than adversarial.").  This obligation holds even where the plaintiff is represented by counsel.  *See Moran*, 569 F.3d at 112.

"When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant, and plaintiff bears the burden of establishing such harmful error."  *DeMico*, 2018 WL 2254544, at *7.  *See Pratts,* 94 F.3d at 37–38.  However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *DeMico*, 2018 WL 2254544, at *7. (quoting *Rosa*, 168 F.3d at 79 n.5) (citation and internal quotation marks omitted).  "Accordingly, the duty to develop the administrative record is triggered 'only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled.'"  *Id.*  (citation omitted).

### 3. Whether *Lundie* Announces a *Per Se* Trigger of An Obligation to Develop the Record

Before turning to the analysis of whether any clear gaps exist in the record warranting remand for further development, the Court addresses one other antecedent argument raised by the plaintiff. In her briefing, the plaintiff cites SSR 85-16 and a recent Second Circuit decision, *Lundie v. Kijakazi*, No. 21-1203-CV, 2022 WL 1154122, at *2 (2d Cir. Apr. 19, 2022) (summary order), for the proposition that an ALJ's affirmative obligation to investigate the record is *per se* triggered when the administrative record simply references records that are not before the ALJ. (*See* Doc. No. 12-1 (claiming that "the ALJ erred when he failed to request records referenced in the record" pursuant to *Lundie*); Doc. No. 17 (contending *Lundie* stands "for the proposition that the ALJ has a duty to request medical records cited within the evidence")).

It is true that "SSA guidelines provide that when the report of a current treating source discloses other sources of medical evidence not previously reported, 'these sources should be contacted, since it is essential that the medical documentation reflect all available sources, particularly in instances of questionable severity of impairment or inconclusive RFC.'" *Shand v. Colvin*, No. 3:1- CV-761 (JGM), 2018 WL 389179, at *15 (D. Conn. Jan. 12, 2018) (quoting SSR 85–16, 1985 WL 56855, at *2 (S.S.A.1985)) (cited by the plaintiff). However, the Court disagrees that *Lundie* or the SSA guidelines work as rigidly as plaintiff suggests.

First, SSR 85-16 states that an ALJ "*should*" contact other sources disclosed in the record but does not require the ALJ to do so. SSR 85–16, 1985 WL 56855, at *2 (emphasis added). This permissive phrasing comports with the countervailing principle in inadequate development of the record claims that, "where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5.

Second, though summary orders such as *Lundie* do not carry binding precedential effect, *see Lebron v. Sanders*, 557 F.3d 76, 77 n.2 (2d Cir. 2009), as "[s]ummary orders are, nevertheless, considered persuasive authority, and may be instructive to district courts in resolving particular disputes," the Court finds it relevant to discuss why *Lundie* does not stand for the proposition that plaintiff suggests. *Doe v. Nat'l Ramah Comm'n, Inc.*, No. 16-CV-6869 (NSR), 2018 WL 4284324, at *6 (S.D.N.Y. Sept. 7, 2018) (cleaned up). *Lundie* is a disability appeal case in which the plaintiff appeared *pro se* and "suffer[ed] from cognitive impairments" including diagnosed schizophrenia and averred "extreme" forgetfulness. *Lundie*, 2022 WL 1154122, at *2. Thus, Lundie was "less able to participate in the proceedings" which "heightened" the ALJ's duties and made the development of the record "particularly important." *Id.* (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 514 (2d Cir. 2002)). *See Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) ("[W]hen a claimant appears *pro se* and is otherwise impaired, we must make a searching investigation of the record to make certain that the claimant's rights have been adequately protected.") (citation and internal quotation marks omitted). The panel thus found that the ALJ failed to develop the record because medical records and hearing testimony "reveal[ed]" to the ALJ that the claimant had been involuntarily committed to a hospital in 2004, two years prior to his period of disability, yet the ALJ "failed to request medical records from [the] [h]ospital, or to explore the circumstances that led to Lundie's 2004 hospitalization." *Id.* The Second Circuit reasoned that such "[e]vidence relating to Lundie's 2004 hospitalization and subsequent treatment may have significance for his [later] claim of disability." *Id.*

This fuller picture of *Lundie* renders the plaintiff's *per se* trigger argument unavailing. (*See* Doc. No. 12-1 at 5-7; Doc. No. 17 at 2). *Lundie* cannot stand for the proposition that merely having another treating source mentioned in the administrative record automatically commands an ALJ

to investigate and obtain their records. Rather, *Lundie* affirms the entrenched principle in this Circuit that an ALJ must be on heightened alert for mention of such missing sources not already in the record when considering claims involving plaintiffs (especially *pro se* plaintiffs) with established mental and cognitive impairments and where such records may shed further light on those impairments. *Lundie*, 2022 WL 1154122, at *2. *See Shand*, 2018 WL 389179, at *14 (The ALJ's duty to develop the record "is heightened in cases where the claimant is mentally impaired" and consideration of mental impairment was at issue); *Petruck v. Berryhill*, No. 3:18-CV-715 (AWT), 2019 WL 2171265, at *2 (D. Conn. May 20, 2019) (stating same); *Parker*, 2015 WL 928299, at *12 ("[T]he ALJ's duty to develop the record is 'especially important' in cases involving mental impairment."); *accord Beutel v. Berryhill*, No. 3:17-CV-01193(SALM), 2018 WL 3218662, at *6 (D. Conn. July 2, 2018) (stating same). However, as discussed below, the plaintiff, like Lundie, suffered from multiple severe mental and cognitive impairments—including PTSD, ADHD, bipolar I disorder and personality disorder—and so the ALJ's duty to develop the record and "probe the relevant facts" was "particularly important." *Lundie*, 2022 WL 1154122, at *2.

### 4.    Maynard Evaluation, Whiting Records, and Yale Records

Turning to the merits of the issue, the Court finds that the appended records point to "significant" gaps in the record and warrant remand. *Santiago*, 2011 WL 4460206, at *2. *See Rosa*, 168 F.3d at 79 n.5. Had the gaps in the record been filled by information contained in these records, the ALJ "might have changed the residual functional capacity and perhaps the disability determination[.]" *Petruck*, 2019 WL 2171265, at *3.

Here, the ALJ found that the plaintiff had a plethora of severe mental impairments including PTSD, ADHD, bipolar I disorder, and personality disorder. (Tr. 13, 24). The symptoms

suffered from these impairments trace back to at least 2018.  (Tr. 13, 24).  However, after formulating the plaintiff's mental RFC, the ALJ found her capable of doing "simple, routine tasks, but not at a strict, production rate pace, and [she] could execute simple, routine instructions. She could tolerate occasional, brief interaction with the general public and occasional interaction with co-workers. She could not engage in tasks requiring close collaboration or teamwork with co-workers."  (Tr. 15).  Given this mental RFC, the ALJ's decision ultimately credited the VE's opinion that a hypothetical person with the plaintiff's mental limitations could perform three other jobs in the national economy and, accordingly, was not disabled.  (Tr. 27-28).  Notably, however, the VE further testified that, if the hypothetical person was "off task" for any more than ten percent of the workday (*i.e.*, needed to remain on-task 90 percent of the workday) or missed more than one day of work per month, that person would be unemployable, *i.e.*, disabled.  (Tr. 80).  The ALJ determined that the plaintiff's mental RFC fell within these bounds as he found her fit to perform the other jobs proposed by the VE.  (*See* Tr. 27-28).  Crucially, then, it appears that the plaintiff's ability to remain "off task" for no more than ten percent of her day or miss work no more than one day each month on a random, unscheduled basis was a dispositive determination, and the record must have been developed enough to allow for the ALJ to determine whether she fell outside these limitations.  The Court cannot conclude so here.  *See Angelica M. v. Saul*, No. 3:20-CV-00727 (JCH), 2021 WL 2947679, at *9 (D. Conn. July 14, 2021) (remanding for further development for the record where it was "unclear how the ALJ concluded that [the claimant's] symptoms would not require" her to miss more than the acceptable "off-task" time).

In formulating the plaintiff's mental RFC, the ALJ cites to observations contained in, *inter alia*, hospital discharge records, physical exam notes, oncology treatment notes from Hartford Hospital, and rehabilitation notes.  (Tr. 24-25). The ALJ also cites to treatment notes from

psychiatric nurses and social workers at Intercommunity Mental Health ("Intercommunity"), who saw the plaintiff for individual counseling and medication management from March 2019 through December 2019 and February 2020 through October 2020. (Tr. 24-25; *see* Tr. 2327-23777, 2522-2586, 2910-3047). But, apart from two mental status examinations in 2019 discussing her "thought process" and the self-reported manic symptoms and intrusive thoughts noted by the consultative examiner, (Tr. 25-26), the majority of the ALJ's treatment note citations are to observations about her (generally good) mood and affect. (*See, e.g.*, Tr. 24-25 ("claimant's bipolar type II disorder was noted to be currently well controlled" in October 2018); *id.* ("claimant had dysphoric mood, as she discussed financial problems" in February 2019); *id.* ("claimant started on Geodon for psychosis associated acute decompensation of bipolar disorder, with good effect. The claimant was noted to be more organized, with overall improvement in paranoia" in March 2019); *id.* ("claimant . . . was 'back to her baseline'" and "exhibited normal mood and affect" in April 2019); *id.* ("claimant exhibited labile mood" in May 2019); *id.* ("claimant's mood was pleasant and calm" in May 2019); *id.* ("claimant had normal mood and affect. Her behavior was normal" in June 2019)) (internal record citations omitted). These notes do not discuss or opine as to the plaintiff's ability to remember, concentrate, or maintain attention at a job over 90 percent of a workday or her ability to adhere to a regular work schedule without missing more than one day a month.

In this context, the omission of the 2020 Maynard Evaluation is "significant," *Santiago*, 2011 WL 4460206, at *2, because the plaintiff's treating psychiatric nurse at Intercommunity specifically referred her for an evaluation to "assess her current neuropsychological functioning and assist with treatment recommendations." (*See* Doc. No. 12-5 at 2). That is, Dr. Maynard was sought out precisely because she had a level of experience and expertise beyond that of the plaintiff's regular treating mental health providers. (*See id.*; *see also* Tr. 2984, 2990). Moreover,

26

the Maynard Evaluation itself is an in-depth neuropsychological assessment, administered by a neuropsychologist, in-person, taken over the course of two days and employing a battery of different objective tests. (*See* Doc. No. 12-5 at 5). The results of these tests showed that the plaintiff had a "number of areas of cognitive weakness . . . . consistent with her report of a long history of problems with attention and memory." (*Id.* at 1). Specifically, the Maynard Evaluation reported that the plaintiff has "demonstrated weaker or impaired performance" in at least ten different cognitive domains including, "sustained and divided visual attention;" "new learning and active retrieval of list of list information;" "processing speed;" and "brief, simple auditory attention." (*Id.* at 5). The plaintiff's emotional and personality test results "indicated ongoing severe levels of anxiety and depression which are likely impacting her concentration and daily functioning." (*Id.* at 6).

Given that this missing evidence was not before the ALJ, the Court cannot say that the record was adequately developed as to the plaintiff's mental RFC when the ALJ determined that the plaintiff was able to perform within the ten percent off-task or one-day-off-a-month limitations. Without the benefit of the Maynard Evaluation, the ALJ was left to "'rely[] heavily" on the findings of a single consultative physician who "had minimal interaction with the claimant." *Angelica M.*, 2021 WL 2947679, at *8 (quoting *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019)) (internal quotation marks omitted). The Second Circuit has "frequently cautioned" ALJs to "not rely heavily on the findings of consultative physicians after a single examination." *Estrella*, 925 F.3d at 98 (quotation mark and citation omitted). "This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health." *See id.* (finding that opinion of "a one-time

consultative psychologist [did] not provide a good reason for diminishing" the opinion of a physician who had treated the claimant for a lengthy period).

Similarly, the Whiting Records are a discharge summary that contextualize the plaintiff's two-month stay at the institution between August and October 2018, a month after her application in this case. (*See* Doc. No. 12-4). The Whiting Records are signed by the attending psychiatrist. (*Id.*). The records specifically attribute the fact that the plaintiff's "attention and concentration were impaired" as one of the main reasons she was admitted to Whiting and go on to describe in detail her responses to mental health treatment and medication. (*Id.* at 1). Yet, despite the ALJ's acknowledgement of the plaintiff's severe mental impairments, his own decision noting that she had been in Whiting, (Tr. 13), the plaintiff herself testifying as to having "checked [herself] in" to a hospital for depression after an incident with her landlord "a few years" prior to the administrative hearing in November 2020, (Tr. 60-61), and other records in the transcript affirming she had been seen at Whiting Forensic Institute, (*See, e.g.*, Tr. 2421 (treatment note observing that "she is resident of the Whiting Forensic Institute . . . and needs conservatorship")), the ALJ decided not to seek out more information about her time there. These facts are similar to those in *Lundie*, and, like the Court in *Lundie*, this Court finds that the ALJ's "fail[ure] to request medical records from [Whiting] Hospital, or to explore the circumstances that led to [the plaintiff's] hospitalization" there constitutes an error in developing the record in this case given her mental impairments and their potential relevance to her disability determination.[17] *See Lundie v. Kijakazi*, No. 21-1203-CV, 2022 WL 1154122, at *2 (2d Cir. Apr. 19, 2022) (summary order). Here, the

---

[17] The Commissioner additionally attempts to dispel the importance of the Whiting Records by pointing out that they do "not support limitations greater than the ones already included in the residual functional capacity." (Doc. No. 14-1 at 4). However, it is the province of the ALJ, not Commissioner's counsel, to weigh the evidence available to make an RFC finding. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Moreover, "[a] reviewing court may not accept appellate counsel's post hoc rationalizations for agency action." *Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009).

ALJ was also "presented with documentary and testimonial evidence" that the plaintiff suffered from severe mental and cognitive impairments, and with further evidence that she was hospitalized at a forensic institution during the time period of her disability claim, yet entirely "fail[ed] to probe the[se] relevant facts."  *Id.* Such error is harmful because the Whiting notes regarding her "hospitalization and subsequent treatment may have significance for [her] claim of disability."  *Id.*

Lastly, the Yale notes referenced in the record, (Tr. 3300, 3302), and appended to the plaintiff's reply brief, address her April 4, 2019, visit to Yale's "Stem Cell Transplant Clinic at Smilow Cancer Center for evaluation for autologous transplant for IgG kappa multiple myeloma." (*See* Doc. No. 17-1 at 17).  While these notes observe her social and psychiatric history in a general manner, (*see id.* at 20), they focus on her myeloma cancer treatment and ultimately conclude that

> [W]e do not feel that immediate transplant is absolutely indicated at this time since she has responded well to RVD [Revlimid +Velcade + dexamethasone].  Another valid approach to her therapy would be to start maintenance Revlimid now and consider autologous transplant if she relapses. We told [the plaintiff] that we would discuss this with Dr. Baker, and we are happy to see her again for more discussion of transplant if he feels strongly that it should be done now or if her clinical status changes.

(*Id.* at 21).

These Yale notes do not point to any significant gaps in the record as to her mental health or cancer treatment since the ALJ's decision thoroughly chronicles her myeloma treatment before and after this visit, which included continuing on Velcade and dexamethasone.  (*See* Tr. 17-19). At no point did the plaintiff return for further discussions regarding a stem cell transplant.  Thus, the ALJ did not err in declining to investigate or seek these records, the records were not "significant" as it pertained to the plaintiff's cancer treatment and the ALJ otherwise "possesse[d] a complete medical history" as to her multiple myeloma and its treatment.  *DeMico v. Berryhill*, No. 3:17-CV-00805, 2018 WL 2254544, at *7 (D. Conn. May 17, 2018) (Merriam, J.)

### 5.    Medical Source Statements

The plaintiff argues that the ALJ erred as a matter of law when he failed to obtain a medical opinion, *i.e.*, a medical source statement[18], regarding the plaintiff's mental health and mental limitations from any of her treating providers.  (Doc. No. 12-1 at 7-9; Doc. No. 3-4).  Further, the plaintiff claims that the consultative examiner's statements were "cherry picked."  (*Id.*).  The Commissioner does not deny that the ALJ did not seek a treating source statement but instead argues that the ALJ had sufficient evidence to render a decision as the ALJ "considered thousands of pages of medical records in addition to consultative psychological examiner Dr. Pleshkevich." (Doc. No. 14-1 at 7).

"A medical source statement is not necessarily required to fully develop the record where 'the record contains sufficient evidence from which an ALJ can assess the claimant's RFC.'" *Mirna C. v. Kijakazi*, No. 3:21CV1296 (MPS), 2022 WL 4285694, at *2 (D. Conn. Sept. 16, 2022) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013)) (cleaned up).  *See Angelica M.*, 2021 WL 2947679, at *5 ("The Second Circuit has held that it is not *per se* error for an ALJ to make a disability determination without having sought the opinion of the claimant's treating physician.") (internal quotations and citations omitted).  "The determination of whether an administrative record is incomplete without a medical source statement is made on a case-by-case basis, depending on the circumstances of the particular case, the comprehensiveness of the administrative record, and whether the record is sufficiently comprehensive to permit an informed finding by the ALJ."  *Mirna C.,* 2022 WL 4285694, at *2 (quoting *Faussett v. Saul*, No. 3:18-CV-738 (MPS), 2020 WL 57537, at *3 (D. Conn. Jan. 6, 2020)) (internal quotation marks and citations

---

[18] Under Social Security Regulations, a "medical opinion," often called a "medical source statement," is a "statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions in the following abilities" enumerated at 20 C.F.R. § 4040.1514(a)(2)(i)-(iv).  *Id*.

omitted).    Conversely, "simply having a medical source statement in the record is not, dispositive." *Angelica M.*, 2021 WL 2947679, at *5 (cleaned up).  "Even when the record includes such a statement, courts will occasionally still remand for failure to develop the record if the medical opinions on record do not sufficiently address the claimant's limitations."  *Id.* (citing *Delgado v. Berryhill*, No. 3:17-CV-54(JCH), 2018 WL 1316198, at *7 (D. Conn. Mar. 14, 2018)).

Though the transcript contains medical records covering a variety of different illnesses from an array of different providers, it is still entirely "unclear how the ALJ concluded that" the plaintiff's impairments and symptoms "would not require her to miss . . . time" away from work. *Angelica M.*, 2021 WL 2947679, at *9.  The fact that the record here is indeed voluminous does not change this conclusion.  *Cf. id.* at *6 (opining that "of course, the bare number of medical opinions [in a record] is not determinative" of the record being adequate).

As discussed above, the ALJ's mental RFC provided that the plaintiff, despite her several mental impairments, was (a) able remain on task 90 percent of the time (that is, her "off task" time was limited to no more ten percent) and (b) would not miss more than one day of work each month. (Tr. 80).  The notes cited by the ALJ mostly discussed the plaintiff's mood, often highlighting the periods when she was at baseline.  (See Tr. 24-26).  The medical opinions of the consultative examiner and the state agency consultants do not address whether the plaintiff's impairments may affect her "off task" time or whether she would miss work more than one day a month.  (Tr. 25-26).  In fact, the consultative examiner noted the plaintiff's own reports that she was "unable to concentrate on tasks for more than 30 minutes," yet his ultimate clinical opinion did not address this further.  (Tr. 2246, 2249).  Further, the Mini Mental Status ("MMS") exam that the consultative examiner performed, and which that the ALJ found "highly persuasive," (Tr. 26), does not address "off-task" time or the plaintiff's ability to attend work but rather goes to her

ability to perform simple, routine tasks.[19]  Thus, the opinions "on record do not sufficiently address the claimant's limitations" as to her ability to maintain the required productivity and attendance requirements.  *Angelica M*., 2021 WL 2947679, at *6.  "Further development of the record is necessary to address questions like these."  *Id.* at *9.

Further, "[i]t is not the case that the medical opinions necessary to fill the gaps in the record—particularly the gaps related to questions about how frequently her impairments would cause her to miss work or be off task—could not have been obtained."  *Id.* at *9 (cleaned up).  The record clearly shows that the plaintiff's treating providers at Intercommunity, including APRN Zoe Walker, who regularly saw the plaintiff, (*see, e.g.*, Tr. 2916-2926), and ordered the initial neuropsychological evaluation, could opine on these issues to fill the gaps in the record.[20]  "[I]t is precisely in these circumstances where medical source statements from physicians familiar with the claimant's condition over a prolonged period are particularly important to develop the record."  *Id.* at *8. This is particularly true here, where the Maynard Evaluation and Whiting Records, both of which would have provided important information about the plaintiff's mental impairments, were not included in the record.

"On remand, the ALJ should seek . . .  a current medical opinion from [the plaintiff's] current treating" mental health provider who may opine on potential limitations discussed above.  *Id.* at *9.

---

[19] The consultative examiner's MMS exam noted that she was "fully alert and oriented. She was able to recall 2 of 3 words after a brief delay. She was able to spell a word backward and was able to complete a 3-step process. Her observed affect varied from unremarkable to depressive, and she wept numerous times during the interview." (Tr. 2248).

[20] Because the plaintiff's application was filed after March 27, 2017, (Tr. 10), amendments to the controlling regulations provide that an "acceptable medical source" includes a "Licensed Advanced Practice Registered Nurse [APRN], or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice[.]" 20 C.F.R. § 404.1502(a)(7).  This would include APRN Walker.

### C.    Constructive Reopening

The plaintiff argues that, because ALJ Aletta's decision in the 2018 Claim "invade[d] a prior closed period" by "cit[ing] to and rel[ying] on evidence in the earlier timeframe," *i.e.*, considered evidence going as far back as 2015,[21] he "constructively reopened" the 2015 Claim pursuant to *Byam v. Barnhart*, 336 F.3d 172, 179-80 (2d Cir. 2003).  (Doc Nos. 12-1 at 9; 17 at 4-6).  Accordingly, because a "constructive reopening" occurred, the plaintiff contends that the ALJ was required to import and consider the plaintiff's Social Security file from the 2015 Claim into the adjudication of this decision.   (Doc Nos. 12-1 at 9; 17 at 4-6).   This argument misunderstands the concept of "constructive reopening."

In *Byam*, the Second Circuit addressed a federal court's power to review an ALJ's decision to not reopen a disability application pursuant to 20 C.F.R. §§ 416.1488 and 416.1489.   These regulations provide an express pathway for a claimant to reopen a prior decision where, *inter alia*, there is "good cause."[22]  However, when an ALJ decides not to reopen a prior decision, this action is unreviewable by federal courts because, "[a]s a general rule, federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits."  *Byam*, 366 F.3d at 179.   "Nevertheless, federal courts may review the Commissioner's decision not to reopen a disability application in two circumstances: where the Commissioner has constructively reopened the case and where the claimant has been denied due process."[23]  *Id.* at 180.  The Second Circuit

---

[21] For example, the ALJ's decision refers to medical records relating to her degenerative disc disease going back until 2017 and seizure disorder going back to 2015.  (*See* Tr. 20, 23).

[22] Social Security regulations governing both DBI and SSI claims provide that, as relevant here and in *Byam*, a "determination, revised determination, decision, or revised decision may be reopened . . . [w]ithin four years of the date of the notice of the initial determination if we find good cause[.]" 20 C.F.R §§ 416.188(b), 404.988(b). The Commissioner will find "good cause to reopen a determination or decision if— (1) New and material evidence is furnished; (2) A clerical error was made; or (3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made."   20 C.F.R §§ 416.189(a), 404.988(a).

[23] The plaintiff makes no due process argument here and accordingly the Court does not address this circumstance.

has explained that, "[i]f the Commissioner reviews the entire record and renders a decision on the merits, the earlier decision will be deemed to have been reopened, and any claim of administrative *res judicata* to have been waived and thus, the claim is subject to judicial review." *Id.* (cleaned up). Put another way, an "ALJ may have *constructively* reopened Plaintiff's prior case when she reviewed the entire record '*de novo*.'" *Steven R. v. Comm'r of Soc. Sec.*, No. 5:19-CV-992 (FJS), 2020 WL 2129263, at *4 (N.D.N.Y. May 4, 2020) (emphasis in original).

In addressing constructive reopening claims, courts in this Circuit have made additional clarifications to the doctrine. First, courts have repeatedly rejected the argument that the doctrine "sweeps so broadly" such "that a prior application is constructively reopened simply because, in adjudicating a later application, the ALJ had considered evidence from the earlier period" to establish a plaintiff's medical history or background but did not assess the merits of the earlier application. *See Hussain v. Comm'r of Soc. Sec.*, No. 13-CV-3691, 2014 WL 4230585, at *11, 13 (S.D.N.Y. Aug. 27, 2014) (citation and internal quotation marks omitted) (collecting cases), *report and recommendation adopted*, No. 13-CV-3691, 2014 WL 5089583 (S.D.N.Y. Sept. 25, 2014). As a practical reality, "ALJs regularly review prior evidence for the purpose of considering an open application, as such evidence is often relevant to the claimant's medical condition for the period in which benefits are claimed." *Hussain*, 2014 WL 4230585 at *12. The *Hussain* court thus held, "[g]iven this reality, a court should not infer that an ALJ considered the merits of a prior application simply because the ALJ reviewed medical evidence dating from the prior application period." *Id.*

Second, courts have rejected claims of constructive reopening where the ALJ did not or could not have "review[ed] the entire record." *Byam*, 366 F.3d at 180. For example, in *Burtugno v. Comm'r of Soc. Sec.*, No. 17-CV-2344 (JPO), 2018 WL 3650131, at *2 (S.D.N.Y. Aug. 1, 2018),

the court rejected a plaintiff's constructive reopening claim where the current ALJ had been unaware of the prior ALJ's decision and thus it was "safe to infer that the later ALJ did not obtain the record that was presented[.]" *Id.* Moreover, the plaintiff gave "no indication that he, himself, submitted 'the entire record'" that was before the prior ALJ to the current ALJ for his review. *Id.* (collecting cases finding the same).

Given this Circuit's definition of constructive reopening, the Court cannot find that the ALJ here constructively reopened the 2015 Claim. As an initial matter, the plaintiff never sought an express reopening of the ALJ Noel's decision as to the 2015 Claim under the relevant "good cause" regulations. *See* 20 C.F.R. §§ 404.987, 404.988. In fact, the plaintiff ceased pursuing the 2015 Claim in federal court in August 2019. *See* Part I, *supra.* It is not surprising, then, that the ALJ did not address the issue of reopening in his decision at all, despite having the adverse decision of the 2015 Claim before him in the record. (*See* Tr. 10-28; 84-101). Further, the plaintiff has failed to show that the ALJ's decision as to the 2018 Claim relied on "substantive review of evidence submitted in previous applications."[24] *See Byam*, 336 F.3d at 181 ("Byam makes no showing that the ALJ ruled on the merits of the earlier evidence, and nothing in the record indicates that the ALJ's disability determination was based on anything other than evidence submitted as part of the [later] application."). (S*ee* Tr. 8-34).

Moreover, the plaintiff's argument that ALJ Aletta "should have obtain[ed] the prior claim file and combine it with the current claim" because "much of the evidence previously submitted to Social Security is *not* in the administrative record" is fatal to her claim of constructive reopening.

---

[24] The plaintiff attempts to equate evidence considered prior to 2018 as necessarily having been the same "evidence submitted in previous applications" yet entirely fails to support this necessary factual assertion in her briefing. *Byam*, 336 F.3d at 180. Nonetheless, the court observes that the medical records submitted in both claims appear to be entirely different and contain only one potential overlapping record. (*Compare* Tr. 31-34, *with* 105-06).

(Doc. No. 12-1 at 1) (emphasis added). Given that ALJ Aletta admittedly did not have this evidence before him—including any evidence from 2014, which was included in the 2015 Claim (Tr. 105)—it is impossible to find that he "reviewed the entire record '*de novo*'" as the constructive reopening doctrine requires. *Steven R.*, 2020 WL 2129263, at *4 (citing *Byam*, 366 F.3d at 180). Since "the Court cannot conclude that ALJ [Aletta] 'review[ed] the entire record and render[ed] a decision on the merits,'" the plaintiff's claim of constructive reopening fails. *Burtugno*, 2018 WL 3650131, at *2. *See also Columbel v. Comm'r of Soc. Sec.*, No. 16 Civ. 773, 2017 WL 3175599, at *15 (N.D.N.Y. July 26, 2017) (concluding that an ALJ had not constructively reopened an earlier application where the ALJ "did not obtain the file that was submitted for that prior application"). *But see Malave v. Sullivan*, 777 F. Supp. 247, 252 (S.D.N.Y. 1991) (finding a constructive reopening where the "ALJ considered the entire record in the case, including medical evidence as far back as 1984 and testimony about periods before then").

> **D.    The Plaintiff's Remaining Arguments**

"While the court does not consider it necessary to address all of [the plaintiff's] remaining arguments, the court nonetheless addresses a few additional issues to guide the ALJ's consideration on remand in the interest of avoiding future remands." *Delgado v. Berryhill*, No. 3:17-CV-54 (JCH), 2018 WL 1316198, at *16 (D. Conn. Mar. 14, 2018).

### 1.    The Vocational Expert's Opinions

First, the plaintiff contends that his objections to the VE's testimony, *see* Part II.B n.6 *supra*, were not ruled on "at the hearing or in [the ALJ's decision]" and that this is error pursuant to 20 C.F.R. § 404.939.  (Doc. No. 12-1 at 1).  This regulation states that, upon a proper objection, an "administrative law judge will make a decision on your objection(s) either at the hearing or in writing before the hearing."  20 C.F.R. § 404.939.

The plaintiff's argument is factually inaccurate.  As the Commissioner's brief illustrates, the ALJ's decision clearly ruled upon the objection by overruling it:

> I hereby take note of the representative's objection to the vocational expert testimony and request for supporting documentation from the vocational expert, but deny the request for any additional vocational expert information. The vocational expert has professional knowledge and experience in job placement. The vocational expert stated she testified based on professional knowledge and experience. Accordingly, the vocational expert's job information is found to be reliable.

(Tr. 11).

Second, the plaintiff argues that the ALJ failed to resolve a purported conflict between the VE's testimony and "the DOT/[SOC] as required by SSR 00-4p."  (Doc. No. 12-1 at 21-22; Doc. No. 17 at 11-12).  The gravamen of this claim is that, because the VE only cited national job numbers for the potential jobs the plaintiff could perform, (*see* Tr. 66-67), and could not provide job numbers for the region where the plaintiff lives or any geographical increment smaller than national, (*see* Tr. 82), the ALJ erred when she relied on these national numbers provided by the VE in contravention of 42 U.S.C. § 423(d)(2)(A).  (*See* Doc. No. 12-1 a 22 ("Here, neither the VE testimony, nor the ALJ decision include regional numbers. This is required by 42 U.S.C. § 423(d)(2)(A).")).

At step five of the sequential evaluation, "the burden shifts to the Commissioner to show that there [exists] a significant number of jobs in the national economy."  *Butts v. Barnhart*, 388

F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560).  The Social Security Act itself explains that the phrase "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  *Accord* 20 C.F.R. § 404.1566.

"[A]lthough the Second circuit has not addressed whether the ALJ must consider regional job numbers, as well as national job numbers, district courts within this Circuit have determined that the ALJ may rely on either national or regional job numbers."  *Mark E. v. Kijakaz*i, No. 8:20-CV-425 (FJS), 2021 WL 4168590, at *9 (N.D.N.Y. Sept. 14, 2021) (collecting cases).  *See, e.g.*, *Palacios v. Berryhill,* No. 17-CV-04802 (ALC), 2018 WL 4565141, at *11 (S.D.N.Y. Sept. 24, 2018) (citations omitted) (holding that vocational experts do not commit error warranting remand when they "fail[] to give the number of regional jobs available in addition to the number of national jobs available.")

Here, it is the undisputed testimony of the VE that the job numbers provided at the hearing came from the program Job Browser Pro and that the underlying data powering this program came from the Department of Labor, Bureau Labor Statistics, which collects national data on job numbers. (*See* Tr. 79-80).  *See, e.g.* Bureau of Labor Statistics, *Overview of BLS Statistics by Occupation*, https://www.bls.gov/bls/occupation.htm (last visited December 22, 2022) ("BLS conducts an annual mail survey of establishments that provides data on employment and wages by occupation and industry for over 800 occupations and for about 400 industries throughout the Nation, and similar data for all states and selected metropolitan areas.").  Accordingly, the Court finds that it was not error for the VE to fail to include regional numbers in her estimates regarding the number of jobs that exist that the plaintiff could perform.

## 2.    Step Three Analysis of Listing 13.07

The plaintiff was diagnosed with multiple myeloma, a blood cancer, in August 2018.  (*See* Tr. 2732).  The plaintiff argues that the ALJ's finding that she did not meet the requirements of Listing 13.07 Multiple Myeloma (confirmed by appropriate serum or urine protein electrophoresis and bone marrow findings) at Step Three was erroneous because (1) "the ALJ did not provide any rationale or cite to any medical record to support his conclusion that Ms. Spencer did not meet or equal Listing 13.07, and (2) that "the ALJ decision does not contain evidence to support his conclusion that [the plaintiff] did not meet or equal Listing 13.07."  (Doc. No. 12-1).  While the Commissioner does not address the plaintiff's first argument, the Commissioner maintains that the ALJ's finding as to Listing 13.07 is supported by substantial evidence.  (Doc. No. 14-1 at 17-18).

As a general matter, an "ALJ is required to articulate the specific reasons justifying his decision that the claimant does or does not meet the relevant listing."  *Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *5 (D. Conn. Dec. 21, 2017) (citations omitted).  "The failure to articulate reasons can itself be the basis for remand."  *Id.* (citations omitted).  "This is true when the court 'would be unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ.'" *Id.*  (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).  "However, the court is not required to remand if the ALJ's reasons can be discerned from other steps in the ALJ's analysis or from the evidence in the record."  *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).  *See Berry*, 675 F.2d at 469 (noting that, "in spite of the ALJ's failure to explain his rejection of the claimed listed impairments, we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by

substantial evidence").  "In those cases, the ALJ's failure to articulate his reasons can be harmless

error."  The Court finds such a harmless error here.

To meet Listing 13.07, the plaintiff must establish[25] either:

A.  Failure to respond or progressive disease following initial anticancer therapy.

OR

B.  [A] bone marrow or stem cell transplantation. [After which the plaintiff is]
[c]onsider[ed] under a disability until at least 12 months from the date of
transplantation. Thereafter, evaluate any residual impairment(s) under the
criteria for the affected body system.

20 C.F.R. § Pt. 404, Subpt. P, App. 1

The ALJ's entire analysis of Listing 13.07 states that the "plaintiff did not meet or equal

listing 13.07 as the criteria noted therein are not present in the record and her cancer responded

well to treatment and has been in remission thereafter."  (Tr. 14).   On its face, such a conclusory

finding, absent any analysis or support from the record, may warrant remand.  *Howarth*, 2017 WL

6527432, at *5.  However, a review of the "other portions of the ALJ's decision" shows that he

thoroughly considered "credible evidence" of the plaintiff's course of treatment for her multiple

myeloma and that it did not meet the Paragraph A criteria.  *Berry*, 675 F.2d at 469.  Specifically,

in the RFC portion of his decision, the ALJ chronicled the plaintiff's diagnosis and treatment of

multiple myeloma.  (Tr. 17-19).  The ALJ noted that she received anticancer therapy, including

Velcade and dexamethasone, and that her cancer responded well to that treatment. (Tr. 17-19).

These findings are supported by substantial evidence in the record, including the plaintiff's own

testimony that she was in remission, (Tr. 58), and medical evidence that, *inter alia*, demonstrates

that, as far back as February 2020, she continued to "show no detectable disease." (Tr. 2626, 2677,

---

[25] At Step Three, the burden of proof remains with the plaintiff to establish that she meets a listing.  *See Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) ("the claimant has the burden on the first four steps" of the sequential evaluation process).

2710, 2712, 2731).  Moreover, record evidence also shows that Yale rejected her as a candidate for stem cell transplantation after her consult, (Tr. 2710), which is confirmed by the Yale records the plaintiff herself attached to her reply brief.  (*See* Doc. No. 17-1).  Accordingly, the plaintiff could not satisfy the Paragraph B criteria, either.   Therefore, substantial evidence supports the ALJ's finding as to Listing 13.07, and the Court does not find that the ALJ committed any error warranting remand on this ground.  *See Mongeur*, 722 F.2d at 1040.

### E.    Remand for Further Administrative Proceedings Is Appropriate

As "the record was not fully developed, the court does not reach the other issues raised by [the plaintiff] or assess whether the ALJ's [other] findings were supported by substantial evidence." *Christopher S. v. Kijakazi*, No. 3:20-CV-00753 (JCH), 2021 WL 4460254, at *12 (D. Conn. Sept. 29, 2021).  *See Cordova v. Saul*, No. 3:19-CV-0628, 2020 WL 4435184, at *5 (D. Conn Aug. 3, 2020) ("Where, as here, an ALJ fails to adequately develop the record in reaching a conclusion on a claimant's [RFC], the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence").

While the plaintiff requests that the Court enter an order reversing and remanding to the Commissioner for the payment of benefits, (Doc. No. 12), the Court declines to do so.  "To award benefits, a district court must find that, irrespective of the legal error, the record contains 'persuasive proof' of the claimant's disability and 'a remand for further evidentiary proceedings would serve no purpose.'"  *Sonia N. B. A. v. Kijakazi*, No. 3:21-CV-00709-TOF, 2022 WL 2827640, at *10 (D. Conn. July 20, 2022) (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  The Court has reviewed the record and finds that the plaintiff has not provided persuasive proof that, during the relevant time period, she was disabled. This case shall be remanded for a new hearing and decision that addresses the issues discussed above using the proper alleged onset

date.  *See Borelli v. Berryhill*, No. 3:18-CV-801 (VLB), 2019 WL 4233586, at *11 (D. Conn. Sept. 6, 2019) ("Where the ALJ failed to develop the administrative record, remand for a new hearing is appropriate"); *Rosa v. Callahan,* 168 F.3d 72, 80-81, 83 (2d Cir. 1999).

## VI.    CONCLUSION

The Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 12) be **GRANTED in part** and a new hearing be held so that the ALJ may further develop the record consistent with this decision and **DENIED in part** to the extent the plaintiff seeks remand for the payment of benefits.  The Court further respectfully recommends that Commissioner's motion to affirm that decision (Doc. No. 14) be **DENIED**.

This is a recommended ruling.  *See* FED. R. CIV. P. 72(b)(1).  Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order.  *See* D. CONN. L. CIV. R. 72.2(a).  Any party receiving notice or an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection.  *See* D. CONN. L. CIV. R. 72.2(a).  Failure to file a timely objection will preclude appellate review.  *See* 28 U.S.C. §636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. CONN. L. CIV. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

It is so ordered this 27th day of January 2023, at New Haven, Connecticut.

___/s Robert M. Spector_____
Robert M. Spector,
United States Magistrate Judge